# United States Court of Appeals
## For the First Circuit

No. 14-1003

JOHN H. RAY, III,

Plaintiff, Appellant,

v.

ROPES & GRAY LLP; DAVID C. CHAPIN; JOHN D. DONOVAN, JR;
KEITH F. HIGGINS; JESSE J. JENNER; WILLIAM A. KNOWLTON;
OTHON A. PROUNIS; DAVID M. MANDEL; ROBERT G. JONES;
RANDALL W. BODNER; BRIEN T. O'CONNOR; JOY U. CURTIS;
BRADFORD R. MALT; JOAN MCPHEE; JOHN T. MONTGOMERY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

John H. Ray, III, with whom Ray Legal Consulting Group, P.C.
was on brief, for appellant
Michael B. Keating, with whom Christopher E. Hart, Daniel L.
McFadden, Foley Hoag LLP, Lisa G. Arrowood and Arrowood Peters LLP
were on brief, for appellees.

August 25, 2015

**HOWARD**, **Chief Judge**.  John H. Ray III, at the time an associate at the Boston law firm of Ropes & Gray ("Ropes"), was informed in December 2008 that Ropes would not advance him for further consideration as a partner.  Contending that the employer's decision was the result of racial discrimination, and that Ropes retaliated against Ray in various ways after he filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), Ray filed an action pursuant to Title VII in federal district court.  After the district court granted summary judgment to Ropes on the discrimination claim, the retaliation claims proceeded to trial where a jury concluded that Ropes had not unlawfully retaliated against Ray.  Ray now appeals both the district court's summary judgment ruling and several rulings made during trial.  We affirm.

## I. Background

Because the retaliation claims went to trial, we present the facts in the first instance in the light most favorable to the jury verdict.  Smith v. Jenkins, 732 F.3d 51, 59 (1st Cir. 2013).  We recognize that Ray has also challenged the district court's summary judgment decision and that the facts relevant to his discrimination and retaliation claims overlap considerably.  Accordingly, when we reach the summary judgment issue, we consider the facts in the light most favorable to Ray and draw all reasonable inferences in his favor.  Reyes-Pérez v. State Ins. Fund Corp., 755 F.3d 49, 50 (1st Cir. 2014).

With limited exceptions, during the relevant time period Ropes adhered to an "up or out policy" whereby senior associates who were not promoted to or did not continue to advance toward a partner or counsel position were asked to leave the firm. Partnership decisions were made by the firm's nine-member Policy Committee. In an associate's sixth through ninth years the Committee annually considered evaluations of each associate submitted by the firm's partners. Selection was competitive. To be considered for partner, Ropes required that associates garner "consistently superlative" reviews. Although technical legal skills and analytic acumen were important criteria for advancement, the Committee also considered, among other things, an associate's management ability, collegiality, and the needs of particular practice groups or firm offices. In some years, no new partners were named from among a practice group's senior associates.

Ropes typically promoted its associates to partner during their ninth year, although the firm generally endeavored to give associates an indication of their partnership prospects during their eighth year. If it became clear at the conclusion of an associate's eighth year that he or she would not make partner, Ropes asked the associate to leave the firm.

In 2005, Ray joined Ropes as a fifth-year associate, and he received generally positive reviews during his initial year at the firm. But Ray's reviews in 2007 and 2008 proved decidedly less

-3-

positive. In 2007, at the end of Ray's seventh associate year, partner John Donovan informed Ray that becoming a partner would be an "uphill climb" and his chances were likely "no better than even." Donovan expressed specific concern about Ray's interactions with the firm's staff and other associates, noting that Ray's failure to improve his relationships and leadership skills would be a "dealbreaker." Ray's reviews in 2008 remained predominantly negative. Several partners noted Ray's continued difficulties working with associates and staff, while others informed the Policy Committee that Ray had trouble meeting deadlines and needed to improve his writing skills; some indicated that Ray should be given an "exit message."

Donovan met with Ray in December 2008, and informed him that the Policy Committee had concluded that a consensus to promote Ray to partner had not and would not develop. The firm offered him a six-month severance package through June 2009, during which Ray would continue to receive his salary, could use his Ropes office, and could hold himself out as a Ropes associate. Donovan told Ray that finding new employment should be his top priority. Ray requested several extensions of this severance period. The first occurred on the same day as the meeting with Donovan, when Ray inquired whether the period could be extended to September 2009 while he pursued an academic position. In February and April of 2009, Ray made additional requests in light of the prevailing

economic conditions and the limited number of law firms that were then hiring. Ropes denied each request.

As the severance period progressed, and Ray's extensions were denied, Ray began to imply that he did not "feel the [Policy Committee]'s decision was fair or appropriate." In May 2009, roughly six weeks before the end of the severance period, Ropes offered Ray a two-month extension, although the proposal required Ray to release any and all claims against Ropes. Ray rejected the offer on May 14, and sent a draft EEOC complaint to Donovan by e-mail. In that e-mail, Ray stated that he would file the complaint unless Ropes either offered him an indefinite extension of his severance period or a settlement in the amount of $8.5 million. In response, Donovan informed Ray that he was not to return to his Ropes office and that his personal items would be mailed to him.

Ray filed his complaint with the EEOC the following day, alleging that Ropes discriminated against him in deciding not to advance him to partner. He also alleged that Ropes's decision constituted retaliation for complaints that Ray had made to management about the racially-charged remarks of two partners.[1]

---

[1] We address these remarks, below, as pertinent to Ray's challenge to the summary judgment ruling. Although Ray's EEOC complaint alleged that Ropes decided not to promote him in retaliation for these earlier complaints, as explained below, Ray's retaliation claims as tried before the jury and argued on appeal only involve actions that Ropes and its employees allegedly took after Ray filed his EEOC complaint. Specifically, these claims involve two partners' refusal to supply Ray with promised letters of recommendation and Ropes's release of the EEOC's initial

Despite the complaint, Ropes continued to compensate Ray through the conclusion of his severance period.

A few weeks after filing his EEOC complaint, Ray renewed an earlier request for letters of recommendation from two Ropes partners -- Brien O'Connor and Randall Bodner -- to support Ray's application for a position as an Assistant United States Attorney. Although both had previously agreed to write letters, Bodner responded by e-mail that he could no longer "in good conscience" write a letter in light of Ray's EEOC complaint, which Bodner considered a "groundless claim" brought only for Ray's "own personal benefit." Bodner also rejected a later request to recommend Ray for a law school professorship. O'Connor never responded to Ray's renewed request.

The EEOC issued an initial determination letter in January 2011, concluding that the evidence failed to indicate that a violation of the law had occurred. Ray sought reconsideration of that determination, and the EEOC issued a final determination in February 2011. In its reconsidered decision, the agency reaffirmed its determination that the evidence did not support a finding of discrimination but concluded that, after further consideration, the

determination letter to media website "Above the Law."

evidence did support a finding that Ropes had retaliated against Ray for filing his charge with the EEOC.[2]

After the EEOC concluded that conciliation efforts had failed, declined to bring a lawsuit against Ropes, and provided Ray with notice of his right to sue, Ray made his claims public. On May 10, 2011 he faxed the EEOC's final determination to several politicians and the president of the National Association for the Advancement of Colored People. In addition, on May 12, Ray, an alumnus of Harvard Law School, sent a letter to the law school's dean enclosing the EEOC determination and requesting that Ropes be barred from participating in the university's on-campus interview process and be foreclosed from using the university's facilities. That letter was copied to the Harvard Black Law Students Association and the Harvard Law Review.

Legal media website "Above the Law" obtained a copy of the letter to the dean and decided to publish the letter on its blog. Before doing so, the website requested comment from Ropes's Director of Public Relations, Timothy Larimer. In response, Larimer provided the website with an unredacted copy of the EEOC's initial January 2011 determination letter, which contained sensitive and confidential information about Ray's employment at

_____

[2] The record does not make clear when or why the focus of Ray's EEOC retaliation claim shifted from Ropes's decision not to promote him to partner to Ray's filing of his charge with the EEOC.

the firm.  "Above the Law" posted that letter in full on its website, redacting only the name of a particular Ropes employee.

Throughout this period, Ray made several settlement demands.  Armed with the EEOC's reconsidered finding in February 2011, Ray first demanded by e-mail a settlement of at least $10 million.  In May 2011 he increased his request to $21.5 million, and later to $40 million.

In August 2011, Ray filed this lawsuit alleging, among other claims, discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and analogous Massachusetts statutes.  He alleged that Ropes's decision not to advance him to partner was based on racial discrimination and retaliation for his earlier complaints of discrimination to management, and that the firm had also retaliated against him for filing his EEOC complaint and sending letters to Harvard Law School's dean and others.  Ray subsequently moved for summary judgment on the retaliation claims, while Ropes moved for summary judgment on all claims.  The district court granted summary judgment for Ropes on the discrimination claim, ruling that "Ray ha[d] not come forward with plausible evidence that the partner evaluations or the Policy Committee's decision, consciously or unconsciously, were tinged with or influenced by racial animus."  Ray v. Ropes & Gray LLP, 961 F. Supp. 2d 344, 355 (D. Mass. 2013).  For similar reasons, the district court held that Ray had not shown pretext and precluded

him from pursuing at trial his claim that Ropes had retaliated against him (by not making him partner) for reporting prior incidents of alleged discrimination, including the racially-charged remarks of two partners, to management. Id. at 358 n.14. On two of Ray's other claims of retaliation, however, the court denied summary judgment and found that Ray had established a genuine issue of material fact about whether Ropes had retaliated against him by refusing to provide him with letters of recommendation and by providing the EEOC's initial determination letter to "Above the Law." Id. at 357-60.

Those retaliation claims proceeded to trial. During closing arguments Ropes suggested, among other things, that Ray "did not actually believe in" his EEOC claim and that Ray had used it "to try to extort money" from the firm. The jury found in favor of Ropes, and the special verdict form makes clear that the jury concluded that Ray had not established a prima facie case of retaliation because he had not engaged in protected activity under Title VII. The parties do not dispute that the jury so found. In accordance with the verdict form's instructions, the jury thus had no opportunity to consider whether Ropes retaliated against Ray for that activity (neither do the parties dispute this consequence of the jury's finding). This timely appeal followed.

## II. __Analysis__

Ray's appeal follows principally along two paths. First, he asserts that the district court made several errors of law when instructing the jury on the elements of his retaliation claims. Second, he argues that the district court erred in granting summary judgment on his discrimination claim. We consider each in turn.

### A. __The Retaliation Claims__

Section 704(a) of Title VII makes it unlawful for an employer to retaliate against an employee for engaging in certain protected activity. See 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must prove that "(1) he or she engaged in protected activity under Title VII, (2) he or she suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity." Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010).

Title VII protects from retaliation two distinct varieties of activity, both implicated in this case. The statute's participation clause prohibits an employer from discriminating against someone who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 41 U.S.C. § 2000e-3(a). While the participation clause protects employees from retaliation for filing a Title VII complaint, it also "casts its protective cloak much

-10-

more broadly." Rodríguez-Vives v. P.R. Firefighters Corps of P.R., 743 F.3d 278, 283-84 (1st Cir. 2014). The clause also protects, for example, an employee who informally files or defends a charge of discrimination, involuntarily testifies as a witness in a proceeding, or aids a co-worker in asserting her rights. See, e.g., Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 223 (1st Cir. 2007) (complaining to human resource department and EEOC); Deravin v. Kerik, 335 F.3d 195, 204 (2d Cir. 2003) (participating as witness); Eichman v. Ind. State Univ. Bd. of Trs., 597 F.2d 1104, 1107 (7th Cir. 1979) (assisting co-worker in exercising rights).

The statute also protects "opposition activity," distinct from the "participation activity" described above. The opposition clause prohibits employers from retaliating against a person who "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Protected opposition activity includes responding to an employer's inquiries about inappropriate behavior, writing letters protesting an employer's allegedly unlawful actions, or picketing and boycotting an employer. See, e.g., Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 276 (2009) (responding to employer's inquiries); Robinson v. S.E. Penn. Transp. Auth., Red Arrow Div., 982 F.2d 892, 896 (3d Cir. 1993) (letter to congressman); Payne v. McLemore's Wholesale & Retail Stores, 654

F.2d 1130, 1141 (5th Cir. Unit A Sept. 1981) (picketing and boycott activity).  Unlike the participation clause, which protects an employee from retaliation for direct engagement with Title VII proceedings, the opposition clause sweeps even more broadly and protects an employee for more informally opposing an employment activity that might violate Title VII.

As presented at trial, Ray's retaliation claims were premised on two alleged instances of retaliation, each implicating a different type of protected activity.  First, Ray sought to demonstrate that Ropes retaliated against him for filing his EEOC complaint (participation activity) when Bodner and O'Brien refused to supply him with letters of recommendation.  Second, Ray alleged that Ropes retaliated against him for sending letters to Harvard Law School's dean and several other high-profile individuals (opposition activity) by supplying the EEOC's initial determination letter to "Above the Law."

At trial, the district court instructed the jury that Ray's EEOC complaint was protected activity under the participation clause, as a matter of law, "if it is done in good faith."  The court further instructed the jury that, to prove good faith, Ray must show "that he was acting under the sincerely held belief that his right to be free from discrimination had been violated."  By contrast, the court instructed the jury that Ray's opposition activity (his letters) was protected if Ray had shown that it was

-12-

both undertaken "in good faith" and "based on a reasonable belief that [his] employer has engaged in an unlawful employment practice." In both instances, the jury concluded that Ray's activity was not protected by Title VII, thus resolving his retaliation claims on the first prong of the prima facie case. Ray argues that both instructions were erroneous.

### 1. Participation Clause: Ray's EEOC Complaint

#### i. Preservation

Ray first claims that the district court erred in holding that a plaintiff seeking protection for participation activity must show -- as an element of his prima facie case -- that he filed his EEOC complaint in "good faith." Ray describes his challenge as an attack on the jury instructions, an argument that Ropes contends he waived below by requesting an alteration to the jury instructions to affirmatively endorse the good faith element that he now contests. Therefore, we must first determine whether Ray properly preserved this challenge.

Ropes's focus on the final round of instructional skirmishes obscures the court's earlier, definitive resolution of the specific legal question that Ray now challenges on appeal. It is true that Rule 51 requires a party to object to the language of an instruction at the close of trial to preserve any argument for direct appeal. See Fed. R. Civ. P. 51(c)(2); Surprenant v. Rivas, 424 F.3d 5, 15 & n.3 (1st. Cir. 2005). But not all legal rulings

are made during wrangling over jury instructions. For instance, where motions in limine provide a "final and unconditional" resolution of an issue, a party is not required to take further steps to preserve that issue for appeal. Crowe v. Bolduc, 334 F.3d 124, 133 (1st Cir. 2003). Here, although Ray's description of his challenge as one to the "jury instruction, rather than [to] the district court's underlying conclusion, is perplexing," Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 76 (1st Cir. 2002), we need not be distracted by inartful labels. A fair view of the record indicates that Ray adequately objected to the court's legal ruling to preserve the issue for appeal.

Ray's argument before us makes clear that his true concern is with the district court's legal ruling that good faith is an element of the prima facie case. That question was fully litigated at the summary judgment stage and definitively decided during the opening days of trial. By the fourth day of trial the court had held that, under its reading of the law, good faith was a required element. It had further ruled that it would "give instructions which are based largely on the Third Circuit's Pattern Instructions" regarding good faith. As Ray's reply brief points out, his requested alteration to the court's subsequent draft jury instructions (which included the good faith element) -- the one that Ropes contends indicates a waiver -- came only after the court's definitive ruling. Given the court's firm resolution in

-14-

the early days of trial, Ray was justified in assuming that the trial had crossed the Rubicon and that his participation clause claim would unquestionably be tried with a good faith element. We conclude that in these circumstances, Ray was not required to uselessly raise an objection yet again when commenting on the court's draft jury instructions several days later. And we are not alone in our assessment; in similarly unusual circumstances both this circuit and the Supreme Court have concluded the same. Cf. Krock v. Elec. Motor & Repair Co., 327 F.2d 213, 215-16 (1st Cir. 1964) (rejecting argument that defendant's failure to reassert objections during jury instructions waived objections properly raised during trial); City of St. Louis v. Praprotnik, 485 U.S. 112, 120 (1988) (plurality op.) (reaching jury instruction, despite failure to comply with Rule 51, where "the focus of petitioner's challenge is not on the jury instruction itself, but on the denial of its motions for summary judgment and a directed verdict" raising the same legal issue).

Given the considerable attention paid to the "good faith" question in the district court, it should come as no surprise to anyone that the issue is now front and center on appeal. The realities of this record plainly show that the court's "good faith" ruling was firmly in place by the first few days of trial, with counsel's objections definitively noted. Therefore, there is no obstacle to our direct review of that ruling, notwithstanding Ray's

-15-

description of the district court's error as an erroneous "jury instruction."[3]

### ii.    Good Faith and Protected Participation Activity

We must then resolve whether a plaintiff claiming retaliation must act in good faith when engaging in activity protected by the participation clause.

Our precedent makes clear that, unlike opposition activity, a plaintiff who engages in participation activity need

---

[3] In denying a motion in limine on the eve of trial, the district court wrote in an electronic order that "Plaintiff is correct that good faith is not an element of a retaliation claim premised on participation activity." On appeal, Ray argues that the court's subsequent holding that good faith is an element violated the law of the case doctrine. We disagree. Even assuming that the law of the case doctrine applied to the court's interlocutory order, we would "review the decision to reconsider only for a particularly egregious abuse of discretion." Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005). As the parties' draft jury instructions indicated, there was considerable confusion before trial between the parties and the court as to the court's position on the "good faith" element. In the face of this confusion -- and prior to any final judgment on the retaliation claims Ray presented at trial -- it was not an abuse of discretion for the court to clarify its position during the first few days of trial. See United States v. Tejeda, 481 F.3d 44, 57 (1st Cir. 2007). Of course, we still assess whether any change in position prejudiced Ray. See id.; Fiori v. Truck Drivers, Local 170, 354 F.3d 84, 90 (1st Cir. 2004). But we discern no prejudice here. At no point did Ray claim below that his trial preparation had been prejudiced nor, as far as we can tell, did he ever reference the district court's electronic order when discussing the good faith issue during the first few days of trial. Moreover, the order was published a mere four days before trial and long after discovery had concluded. On appeal Ray has not indicated how he was prejudiced during the brief period he may have assumed that he would not need to make any showing of good faith. Finally, the court clarified its position before the jury was even sworn, and Ray was thus provided with a full opportunity to present evidence on the issue -- evidence which included his own testimony.

-16-

not hold a reasonable belief that his employer's actions actually violated Title VII. In Wyatt v. City of Boston, we distinguished between the necessary showings under the participation and opposition clauses and explained that it was "well settled" that the participation clause "protects an employee regardless of the merit of his or her EEOC charge." 35 F.3d 13, 15 (1st Cir. 1994) (citing Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978)). We explained that section 704(a) contains no language indicating that a plaintiff's charges must be valid or even reasonable in order to be protected as participation activity. Id.; accord Glover v. S.C. Law Enf't Div., 170 F.3d 411, 414 (4th Cir. 1999) (holding that "[r]eading a reasonableness test into section 704(a)'s participation clause would do violence to the text of that provision and would undermine the objectives of Title VII").

To establish a prima facie case of protected opposition activity, by contrast, we noted that an employee who engages in opposition activity must hold a "reasonable belief that the practice the employee is opposing violates Title VII."[4] Wyatt, 35 F.3d at 15. We have since reiterated that, to show protected

---

[4] This distinction arguably flows from the statute's text. The opposition clause protects the opposition of "any practice made an unlawful employment practice," while the participation clause does not similarly "connect the protected activity to the unlawfulness of any employment practice." Gilooly v. Mo. Dep't of Health & Senior Servs., 421 F.3d 734, 742 (8th Cir. 2005) (Colloton, J., concurring in part and dissenting in part).

opposition activity, a plaintiff must demonstrate that he held a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law."[5] Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009).

Consistent with the distinction set forth in Wyatt, for purposes of his participation clause claim the district court did not require Ray to demonstrate that his belief that Ropes had discriminated against him was reasonable. The district court did, however, require Ray to show that he made his EEOC complaint in good faith out of a "sincerely held belief that his right to be free from discrimination had been violated."

Ray's sole argument for why the district court erred in that good faith ruling is his cursory statement that Wyatt stands for the proposition that "a showing of good faith for protected participation activity is not required." Yet, Wyatt did not explicitly resolve the good faith issue one way or another. To be sure, Wyatt rejected any requirement that the Title VII claim underlying a plaintiff's participation activity -- like Ray's EEOC charge here -- prove valid or reasonable. 35 F.3d at 15. And we

_____

[5] Although our language was general and could be construed as applying equally to the participation and opposition clauses, Fantini involved a claim under the opposition clause, and we have since cited Fantini as establishing the test specific to that clause. See Collazo, 617 F.3d at 48. Nor could we have overruled Wyatt's holding that reasonableness is not required for participation activity absent an en banc decision by this court. See Muskat v. United States, 554 F.3d 183, 189 (1st Cir. 2009).

-18-

have since described the showing that _is_ required under the opposition clause (which does require reasonableness) as a "good faith, reasonable belief" standard. See, e.g., Collazo, 617 F.3d at 48.

But the fact that Wyatt rejected a reasonableness requirement for purposes of the participation clause does not necessarily, or automatically, indicate that a plaintiff need not engage in participation activity in good faith, either. Unlike the reasonableness requirement, when assessing a plaintiff's good faith a factfinder need only ask whether a plaintiff had a subjective, honestly held belief that her claim was valid. Indeed, we have previously distinguished between a "good faith" belief and a "reasonable belief" in the context of Title VII's anti-retaliation provisions. See Monteiro v. Poole Silver Co., 615 F.2d 4, 8 (1st Cir. 1980) (distinguishing between whether a plaintiff "honestly held" his belief that the employer had engaged in unlawful activity and whether that belief was reasonable). And other circuits similarly view the two as distinct elements, even though they are often coupled together. See, e.g., Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (7th Cir. 1996) (noting that the defendants had "not disputed that the plaintiff believed in good faith that [her co-worker's] comment subjected her to an unlawful employment practice" and addressing only "whether the record supports the jury's finding that this belief was reasonable");

<u>Kissell</u> v. <u>Am. Fed'n of State, Cnty. and Mun. Emps.</u>, 90 F. App'x 620, 622 (3d Cir. 2004) (similar). Accordingly, we fail to see how <u>Wyatt</u>'s rejection of a reasonable belief standard for participation activity necessarily resolves whether a plaintiff must engage in that activity in good faith. <u>Cf.</u> <u>Hochstadt</u> v. <u>Worcester Found. for Experimental Biology</u>, 545 F.2d 222, 230-31 (1st Cir. 1976) (noting that "section 704(a) clearly does protect an employee against discharge for filing complaints in good faith before federal and state agencies").

Ultimately, in this case we need not definitively decide whether a plaintiff must engage in protected activity in good faith in order to invoke the protections of Title VII. <u>Wyatt</u> does not expressly address this question, and Ray cites no other cases -- binding or otherwise -- to support his reading of <u>Wyatt</u>. Nor does he provide any further explanation or argument as to why we should assume that <u>Wyatt</u> intended to hold that good faith is not a necessary element for a participation clause claim, or that Congress intended to protect from retaliation claims of discrimination made in bad faith. Simply put, Ray has not set forth a coherent argument on appeal for why the district court erred as a legal matter in requiring him to show good faith for purposes of the participation clause. Thus, we deem his argument waived for lack of development. <u>See</u> <u>Home Orthopedics Corp.</u> v. <u>Rodríguez</u>, 781 F.3d 521, 532 (1st Cir. 2015); <u>see also</u> <u>Medina-</u>

<u>Rivera</u> v. <u>MVM, Inc.</u>, 713 F.3d 132, 140 (1st Cir. 2013) (finding undeveloped an argument that lacked "even a persuasive explanation of what the law should be, assuming [the party] found no authority"). And because Ray raises no argument that the evidence was insufficient for the jury to conclude he did not act in good faith, we need go no further.

### 2. <u>Opposition Clause: Ray's letters</u>

Ray also argues that the district court's instruction regarding his opposition activity erroneously shifted the jury's focus from Ray's own subjective beliefs about his underlying claim to whether his <u>conduct</u> was reasonable. This deft effort at semantics need not detain us long, however, because Ray affirmatively waived this argument below. <u>See</u> <u>United States</u> v. <u>Jordan</u>, 112 F.3d 14, 18 (1st Cir. 1997). He requested a modification to the jury instructions that stated: "writing letters of protest in good faith to anyone, including a newspaper reporter or a Congressperson, constitutes 'protected activity.'" The district court gave an instruction similar in all relevant respects, stating: "I instruct you as a matter of law that writing such a protest letter is a protected activity if it is done in good faith and based on a reasonable belief that an employer has engaged in an unlawful employment practice such as retaliation." And Ray's counsel raised no objection to that instruction after the jury was

charged.[6]  Thus, having affirmatively requested the alteration and
having "directly bypassed" the "opportunity to challenge and
perhaps modify the instruction[]" as stated by the court, Ray has
"waived any right to object to [it] on appeal."  United States v.
Wall, 349 F.3d 18, 24 (1st Cir. 2003).

Because Ray has not demonstrated that the district
court's participation clause and opposition clause instructions
were erroneous in this case, the jury's verdict on the retaliation
claims is affirmed.[7]

---

[6] Unlike the participation clause question, the court neither
discussed this matter nor definitely ruled upon it before the
charge conference.

[7] To the extent it is necessary to reach Ray's passing
argument that the district court erred in excluding the testimony
of his damages expert, Dr. Moore, the argument lacks merit.  Ray
contends that Dr. Moore's testimony would have corroborated Ray's
good faith "conduct" by demonstrating that his settlement demands
were reasonable.  But Ray did not proffer Dr. Moore's testimony on
this ground below and, therefore, the district court had no
occasion to consider the argument.  "The failure of counsel to have
informed the trial court of the correct evidentiary theory under
which evidence is sought to be admitted is ordinarily a waiver of
the right to argue that theory on appeal."  United States v.
DeSimone, 488 F.3d 561, 570 (1st Cir. 2007).  Ray also argues -- in
a single sentence -- that the district court made no factual
findings regarding the expert report's relevance.  But our own
review of the record shows that the court did make such findings
and concluded that Dr. Moore had not used appropriate comparators
to reach his proffered damages figure and that his report did not
adequately discuss any causal relationship between Ropes's conduct
and Ray's purported injuries.  Ray has made no effort to argue why
those conclusions were in error.

## B. **The Discrimination Claim**

Ray also protests the district court's grant of summary judgment to Ropes on his discrimination claim. We review the district court's determination de novo, viewing the facts in the light most favorable to Ray and drawing all reasonable inferences in his favor. See Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 32, 34 (1st Cir. 2012).

To successfully establish a Title VII disparate treatment claim, Ray must show that he suffered intentional discrimination. See id.; see also 42 U.S.C. § 2000e-2(a)(1). Because Ray has not offered "direct proof" of Ropes's alleged discriminatory animus, "we allocate the burden of producing evidence according to the now-familiar three-step framework set forth in McDonnell Douglas Corp. v. Green." Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995); see also McDonnell Douglas, 411 U.S. 792, 802-05 (1973). Under that framework, Ray must first establish a prima facie case by showing that: "'(1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action against him; and (4) the position remained open or was filled by a person with similar qualifications.'" Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012) (quoting Kosereis v. Rhode Island, 331 F.3d 207, 212-13 (1st Cir. 2003)). If that showing is made, the burden of production then shifts to Ropes, who must establish a legitimate, nondiscriminatory justification for

the adverse employment action (here, the refusal to advance Ray toward partner).  Id. at 94.  If Ropes does so, "the McDonnell Douglas framework 'disappears' and the sole remaining issue is 'discrimination vel non.'"  Id. (alteration omitted) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000)).  Despite the shifting burdens of production, Ray retains the "ultimate burden of persuasion," and to avoid summary judgment he must raise a genuine issue of material fact that "the reasons offered by [Ropes] were a pretext for discrimination."[8] Id.

The district court concluded, and the parties do not contest, that Ray successfully established a prima facie case of discrimination and that Ropes provided a legitimate, non-discriminatory justification for its refusal to advance Ray -- namely, Ray's negative reviews.  Thus, our sole inquiry is whether Ray established a genuine issue of material fact that Ropes's justification is pretextual and the firm's action was, in fact, "improperly motivated by discrimination."  Kosereis, 331 F.3d at 213.  To do so, it is not sufficient for Ray "merely to impugn the veracity of the employer's justification."  Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006) (citations and internal quotation marks omitted).  Instead, Ray "must produce

---

[8] Massachusetts law also makes use of the McDonnell Douglas burden-shifting framework. See, e.g., Knight v. Avon Prods., Inc., 780 N.E.2d 1255, 1261 (Mass. 2003). Like the district court, we discuss Ray's Title VII and Massachusetts discrimination claims in a single analysis.

-24-

sufficient evidence to create a genuine issue of fact as to two points:  1) the employer's articulated reasons for its adverse actions were pretextual, and 2) the real reason for the employer's actions was discriminatory animus."  Mariani-Colón, 511 F.3d at 223.  In other words, Ray must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination."  Azimi, 456 F.3d at 246 (alteration, citation, and internal quotation marks omitted).

With this legal framework in mind, we turn to the specific evidence adduced by Ray before the district court and the arguments made before us on appeal.  Ray points largely to four types of evidence: (1) comparator evidence of other Ropes associates who were promoted to partner or counsel; (2) the alleged promotion of other associates on the basis of "racial" characteristics; (3) the subjective nature of Ropes's review process; and (4) Ropes's poor record of advancing black associates to partner throughout the firm's history.  None of the evidence, however, raises a genuine issue of material fact that the actual reason for Ray's dismissal was racial animus.[9]

---

[9] To be clear, although we separately discuss each type of evidence in turn so that we can set forth our rationale, after considering all of this evidence as an "aggregate package of proof," including the evidence Ray proffered to establish his prima facie case, we conclude that the "totality of the evidence," is insufficient to raise a genuine issue of material fact. Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 581 (1st Cir. 1999).

First, as comparator evidence Ray points to the evaluations of several other associates who, unlike Ray, were advanced to either a partner or counsel position. Ropes responds that the identified individuals are not adequate comparators and, regardless, that Ray merely "cherry-picks" several negative comments without considering the evaluations in their entirety. After a careful review of the evaluations for each putative comparator, we agree with the district court that comparison to these individuals is inapt.

A plaintiff in a disparate treatment case may attempt to show that "'others similarly situated to him in all relevant respects were treated differently by the employer.'" Kosereis, 331 F.3d at 214 (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)). "Reasonableness is the touchstone" when considering comparators in a disparate treatment case; that is, "while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." Conward, 171 F.3d at 20. We ask whether "a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on

We reject Ray's characterization of the district court's separate consideration and rejection of each type of evidence of pretext as indicating it did not, also, consider the evidence in its totality.

-26-

other grounds by <u>Educadores Puertorriqueños en Acción</u> v. <u>Hernández</u>, 367 F.3d 61, 64 (1st Cir. 2004).

The district court reasoned that the associates whom Ray cited are not relevant comparators, in part, because they worked in different practice groups than Ray. We think that conclusion inappropriately circumscribed the universe of associates from which comparison cases could be drawn, however. To the extent that Ray challenges the application of Ropes's consistent superlatives standard, he can look beyond a specific practice group.

But having closely reviewed those evaluations,[10] we nevertheless find that they present "differentiating or mitigating circumstances that would distinguish" Ropes's treatment as to each associate. <u>Perkins</u> v. <u>Brigham & Women's Hosp.</u>, 78 F.3d 747, 751 (1st Cir. 1996) (citation and internal quotation marks omitted). The evaluations of the non-black associates Ray identifies by and large contain a mix of both positive and negative commentary on those associates' work product and ability to work with others. Yet even if we assume, as Ray argues, that those evaluations demonstrate that Ray's work was equivalent to the work of the comparator associates, Ray does not dispute that Ropes's partnership decisions are based on a number of factors beyond the quality of an associate's work. Ray also does not dispute that the

---

[10] The evaluations of comparator associates are sealed. To avoid revealing identifying information, our description is necessarily general.

negative comments partners made in his own evaluations extend far beyond his work product. For example, Ray's evaluations include repeated refrains that he had insulted his co-workers, demeaned junior associates he worked with, and passed off work to others. Suffice it to say that these comments were distinctively more extreme, and more numerous, than those contained in the evaluations of any of the comparators he offered. Thus, those other associates' evaluations bear "too little similarity" to Ray's "to furnish a basis for suspecting racial discrimination." Conward, 171 F.3d at 22.

Second, in addition to comparator evidence, Ray points to some of the same associates to argue that Ropes has a pattern of "regularly us[ing] race in making employment decisions." He alleges that, despite their poor evaluations, several Asian associates (so described by the parties) were promoted to partner because they accepted assignments to the firm's Asian offices. As an initial matter, Ray's assertion that there existed a *quid pro quo* relationship between those associates' relocation to overseas offices and the improvement of their partnership prospects is not supported by the record. The evaluations of those associates he identifies indicate that they made transitions prior to consideration as partner, and not -- as far as the record reveals -- under the direction of partners who insisted that the only path to partnership involved relocation. Moreover, Ray does not dispute

-28-

that those associates had language skills that were valuable assets to the specific overseas offices in which those associates worked. Nor does Ray dispute that an associate's language skills would be a legitimate factor for the firm to consider when placing an attorney in one of its overseas offices or when considering an attorney for partner. Yet, Ray still asserts -- with no factual support or reasoned explanation -- that these "purported objective qualities were used as mere proxies for race." Based on the evidence Ray has proffered, we simply to fail to see how a factfinder could so infer from this record.

Third, Ray contends that Ropes's subjective review process lends credence to his claim of discriminatory animus. To be sure, subjective evaluations may in some circumstances "easily mask covert or unconscious race discrimination." Robinson v. Polaroid Corp., 732 F.2d 1010, 1015 (1st Cir. 1984). But Ray's argument ultimately founders because it is supported only by speculation. He supplies no evidence that creates a credible inference that his own review process was based on any racial animus. He claims that reviews were solicited from partners with whom he had worked rarely, if at all. Our review of the comparator evidence, however, reveals that this practice was not unusual; there exists an established pattern of Ropes partners supplying reviews for associates with whom they had rarely worked, opining on the associate's fit into the culture of the firm or the associate's

ability to solicit business and work collegially with other staff. Such remarks could mask racial discrimination. But in Ray's case they were limited to repeated refrains about his treatment of other associates and firm staff -- refrains corroborated by those partners who <u>did</u> work with Ray. There is nothing about these comments that implies racial animus toward Ray.

Ray also points to two racially-charged remarks, allegedly made by two partners in 2008, which we accept as true for purposes of reviewing a summary judgment ruling. In February 2008 partner Robert Skinner purportedly asked Ray to serve as the "token black associate" or "black face" on a matter. In April 2008, Randall Bodner -- whom Ray later asked for a letter of recommendation -- allegedly related a war story during a mediation, the punch-line of which was that a Mafia informant "beat a nigger to death." Ray says that he complained about these comments to the heads of the litigation department (Roscoe Trimmier and Lisa Ropple), and to the head of the firm's Diversity Committee (Diane Patrick) and that he received negative evaluations from Skinner, Ropple, and Trimmier after making those complaints.

Racially derogatory remarks are certainly "material to the pretext inquiry." Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 125 (1st Cir. 2011). Their probative value, however, is "'circumscribed if they were made in a situation temporally remote from the date of the employment decision in question, or if

they . . . were made by nondecisionmakers.'" Id. (quoting McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals, 140 F.3d 288, 301 (1st Cir. 1998)). Thus, even crediting his account, Ray has not identified any connection between the comments and the Policy Committee's decision that supports an inference of racial animus. Skinner and Bodner were not on the Policy Committee, nor were Ropple, Trimmier, or Patrick. There is also no evidence that the Policy Committee was aware of the offensive comments or of Ray's complaints.

Finally, Ray relies on the statistic that only one black associate had been promoted to partner at Ropes in the history of the firm. If accurate, it is unfortunate -- even troubling -- that as of the time of trial Ropes had promoted only a single black lawyer from its associate ranks to partner in the 150-year history of the firm.[11] But the statistic nevertheless fails to imply pretext here.

In a disparate treatment case "the central focus is 'less whether a pattern of discrimination existed and more how a particular individual was treated, and why.'" LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir. 1993) (alteration omitted) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 156 (1st Cir. 1990)). Therefore, "statistical evidence of a company's

---

[11] Although the district court questioned the veracity of the statistic, Ray, 961 F. Supp. 2d at 356 n.10, Ropes has not challenged its accuracy.

-31-

general hiring patterns, although relevant, carries less probative weight," and "in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision." Id. A statistic is only helpful "if it tends to prove the discriminatory intent of the decision makers involved," which "often will be difficult." Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 32 (1st Cir. 2003). Ultimately, Ray cites only this bald statistic without making any meaningful connection between the lack of black partners and the Policy Committee's decisionmaking process specific to his promotion. Thus, the bare statistic alone fails to support an inference that Ropes discriminated against Ray.

We are mindful that probing an employer's rationale can be difficult. We exercise "particular caution" when considering an employer's motion for summary judgment raising issues of "pretext, motive, and intent." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 34 (1st Cir. 2001) (citation and internal quotation marks omitted). But, ultimately, "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (citation and internal quotation marks omitted). Here, despite Ray's efforts to the contrary, he points us to de minimis evidence, insufficient for a rational factfinder

to infer that Ropes's "actions were based not on [Ray's] perceived failings, but on discriminatory animus." <u>Mariani-Colón</u>, 511 F.3d at 223. Accordingly, the district court properly granted summary judgment to Ropes on Ray's discrimination claim.

### III. <u>Conclusion</u>

For the foregoing reasons, the judgment of the district court is **<u>affirmed</u>**.