# United States Court of Appeals
## For the First Circuit

No. 24-1310

MATTHEW WALEYKO,

Plaintiff, Appellant,

v.

JOHN PHELAN, Secretary of the Navy,[*]

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Howard, Circuit Judges.

Sonja L. Deyoe, with whom Law Offices of Sonja L Deyoe was on brief, for appellant.

Bethany N. Wong, Assistant U.S. Attorney, with whom Zachary A. Cunha, U.S. Attorney, was on brief, for appellee.

July 25, 2025

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Secretary of the Navy John Phelan is automatically substituted for former Secretary of the Navy Carlos Del Toro as Respondent.

**HOWARD**, **Circuit Judge**.  The Naval Undersea Warfare Center ("the Warfare Center"), a division of the U.S. Navy focused on the research and development of submersible weapons systems, asked Appellant Matthew Waleyko to resign at the end of his two-year term of probationary employment.  After his termination, Waleyko sued the Secretary of the Navy ("the Navy"), alleging sex discrimination under Title VII.  The district court dismissed Waleyko's suit for failure to state a claim, and we affirm.

## I.

In reviewing a motion to dismiss for failure to state a claim, "[w]e 'draw the facts from the complaint and its attachments,' taking the well-pleaded facts as true and construing all reasonable inferences in [the plaintiff's] favor." Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 595 (1st Cir. 2024) (quoting Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 161 (1st Cir. 2020)).  Accordingly, we draw on the allegations in Waleyko's complaint to summarize the relevant facts below.

## A.

In June 2020, Waleyko was hired to work as a civilian computer scientist in the Undersea Warfare Platforms and Payloads Integration Department ("UWDC") at the Warfare Center facility in Newport, Rhode Island.  There, he was assigned to a project called "Code 4542" ("Code 45").  Waleyko's employment at the Warfare Center was subject to a two-year probationary period, after which

the Navy did not guarantee his continued employment. As far as his complaint reveals, the first seventeen months of Waleyko's probationary period were uneventful.

In February or March 2022, however, Waleyko's immediate supervisor, Sravanthi Bodana, met with him to discuss complaints made by a female coworker, Beibhinn Gallagher, about his behavior towards her. The complaint alleges that Bodana told Waleyko that Gallagher had reported that "he sounded condescending," and Bodana advised him "to be mindful of tone use" with Gallagher in the future. Waleyko alleges that "Bodana did not use similar language with female employees."

In the same or a subsequent meeting (his complaint leaves the timing unclear), Waleyko alleges that Bodana indicated that Gallagher "made numerous accusations against him." Bodana allegedly asked Waleyko about Gallagher's claim that Waleyko forced her to carpool with him on two Warfare Center-related business trips in November and December 2021, noting that an investigation into the claim was then ongoing. Waleyko disputed Gallagher's accounts. Although maintaining that "he was never told what exactly was being alleged against him," Waleyko alleges that he "became aware that Ms. Gallagher had alleged that she felt sexually harassed by" Waleyko, that she had described him as "stalkerish" because of what the complaint characterizes as "a

- 3 -

joke about sending [her] a gift," and that she had likened him to an "active shooter."

Notwithstanding his meeting(s) with Bodana, Waleyko alleges that he "was never contacted by an investigator, nor asked any questions as to Ms. Gallagher's accusations," and that the Navy "did not investigate the allegations against [him]." Waleyko also maintains that he was "never provided the opportunity to speak or provide evidence during the investigation into Ms. Gallagher's accusations." Waleyko adds in his complaint that "[t]hese sorts of allegations were not made against women in [C]ode 45, and allegations of this type, when they were made, were always made by women against men" and that the Navy "gave credence to" Gallagher's accusations "because he was a male, where as [sic] it did not give credence to similar investigations involving women."

A second disciplinary episode involving Waleyko occurred in early April 2022. Waleyko alleges that around that time another female coworker, Layna Nelson, incorrectly reported to the UWDC's Artificial Intelligence Director, Captain Jeffrey Anderson, that Waleyko had deleted certain of the Warfare Center's code files. In contradiction of this accusation, according to Waleyko, another senior-level employee on the same project informed him that, on April 13, the employee "found the files and ran the code" that Nelson reported missing. Nevertheless, Waleyko alleges that on April 14, the Digital Engineering Division Head -- a "Mr.

McCarthy" -- and Bodana investigated Nelson's claims and questioned Waleyko about the code files. Additionally, sometime after Nelson's report, Anderson allegedly told Christopher DelMastro, the Code 45 Department Head, that "he had concerns that [Waleyko] was an insider threat" based on Nelson's accusations.

As with the Navy's investigation into Gallagher's accusations of misconduct, Waleyko alleges that the Navy unfairly disciplined him based on Nelson's incorrect report. Specifically, he asserts in his complaint that "females would have been asked about where the code was prior to any report being made about alleged misconduct" and that "[n]o female was subjected to similar investigations after it was already proven the conduct being investigated was not true." Waleyko also contends that while Nelson "remains employed and was not disciplined," as a male, "[Waleyko] would have been impacted by negative consequences" had he lodged a similarly false accusation against another employee.

Finally, Waleyko claims that on some other occasion "it was alleged that [he] was emotionally unstable" because he wept in his supervisor's office. Waleyko alleges that he was "investigated over claims he might be an insider threat" because of this episode. He further maintains that "[s]uch an investigation would not have been done if [he] were a female and crying in his supervisor's office, as [he] knows of numerous women who have cried at work and

were not investigated for being emotionally unstable and an insider threat."

Waleyko alleges that he was asked to choose between elective resignation or termination, and he opted to resign. In June 2022, Waleyko received a termination letter signed by DelMastro. Waleyko maintains, however, that his "termination was pretextual and the reasons provided on the notice of termination were a pretense for gender discrimination." He alleges that "DelMastro's [sic] stated to Ms. Bodana that" Waleyko was terminated due to Gallagher's complaints about his conduct, Nelson's accusations of code deletion, and "allegations [that he] was an insider threat." Waleyko adds that, at some other point, McCarthy gave Bodana essentially the same explanation for his termination. Still, Waleyko contends that "[n]o female would have ever been terminated based on these allegations alone" and that these complaints against him "are allegations based on stereotypical male-based behavior."

**B.**

Following his termination and after failing to obtain relief through an Equal Employment Opportunity counselor, Waleyko filed a complaint with the Department of the Navy. The Department of Defense's Investigations and Resolutions Directorate conducted a formal investigation of Waleyko's complaint and issued a final agency decision in February 2023.

Waleyko then filed this action in the District of Rhode Island in May 2023, asserting one count of sex-based discrimination in violation of Title VII and seeking monetary damages. After initial skirmishing and the filing of an amended complaint, the district court granted the Navy's motion to dismiss in February 2024, concluding that Waleyko "failed to specifically describe instances of disparate treatment based on his gender and thus fail[ed] to state a claim" of sex discrimination under Title VII. Waleyko v. Del Toro, 719 F. Supp. 3d 184, 192 (D.R.I. 2024).

This appeal followed.

**II.**

We review de novo a district court's dismissal of a complaint for failure to state a claim upon which relief can be granted. Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009). "To survive dismissal, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Frese v. Formella, 53 F.4th 1, 5-6 (1st Cir. 2022) (citation modified); see also Fantini, 557 F.3d at 26 ("[A] complaint must contain 'enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the claims." (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007))). In this context, "'[p]lausibly' does not mean 'probably,' but 'it asks for more than a sheer possibility that a defendant has acted unlawfully.'" Smith & Wesson Brands,

- 7 -

Inc. v. Estados Unidos Mexicanos, 605 U.S. --, --, 145 S. Ct. 1556, 1565 (2025) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). And while we "indulg[e] all reasonable inferences in [the plaintiff's] favor," we do not accept a complaint's "bald assertions" and "unsubstantiated conclusions." Fantini, 557 F.3d at 26 (first quoting Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006); and then quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)); see also Medina-Velázquez v. Hernández-Gregorat, 767 F.3d 103, 108 (1st Cir. 2014) (applying "two-step approach" of constructively stripping complaint of conclusory allegations and assessing claim plausibility based only on surviving allegations).

Title VII prohibits employers from discharging an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To state a claim of sex discrimination under Title VII, a complaint "must plausibly allege that the plaintiff experienced an adverse employment action taken on the basis of [his] gender." Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012). If, however, "the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Id. (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)). Put another way, based on only the concrete facts alleged and

- 8 -

reasonable inferences therefrom, the complaint must support a plausible finding that the adverse employment action was "taken 'because of'" the plaintiff's sex. Frith v. Whole Foods Mkt., Inc., 38 F.4th 263, 271 (1st Cir. 2022) (quoting Bostock v. Clayton Cnty., 590 U.S. 644, 656-57 (2020)); see also Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2010) ("The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.").

Waleyko essentially alleges that the Navy mishandled each of the three disciplinary episodes detailed above because of his sex and that those events collectively led to his termination.[1] But Waleyko's allegations tying the Navy's actions to his sex are wholly of the speculative variety that we ignore at this stage, see Smith & Wesson, 605 U.S. at --, 145 S. Ct. at 1568, and once

---

[1] Waleyko variably enumerates the Navy's proffered reasons for his termination, counting two sets of three articulated by Navy personnel in his complaint while enumerating the list at five reasons at oral argument. Neither Waleyko nor the government supplied his termination letter to the district court. "Viewing the complaint holistically," García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013), we read the complaint to allege that three events collectively spurred his termination: (1) the investigation into Waleyko's interpersonal behavior, triggered by Gallagher's complaints; (2) the investigation into whether he deleted the Warfare Center's code files, triggered by Nelson's report; and (3) Waleyko's crying in a supervisor's office, which he alleges led to him being "investigated over claims he might be an insider threat."

constructively stripped of those speculative allegations as it must be, see Medina-Velázquez, 767 F.3d at 108, Waleyko's complaint is devoid of any assertions of facts that plausibly indicate a causal nexus between his sex and termination. See Frith, 38 F.4th at 271. On appeal, Waleyko advances three readings of his complaint that he contends support such an inference, and we address each in turn.

## A.

On appeal, Waleyko primarily grounds his arguments in his complaint's purported comparisons between his treatment by the Navy and how he believes the Navy would treat similarly situated women. Because these comparisons all either rely on Waleyko's unfounded suppositions or improperly compare apples and oranges, however, they supply no basis to infer the requisite connection between Waleyko's sex and termination.[2]

Throughout his complaint, Waleyko compares the Navy's three investigations and eventual termination of him with unsupported hypotheses of how the Navy "would" conceivably handle similar accusations of its female employees, but he almost

---

[2] Of course, we do not suggest that such comparator evidence is required to survive a motion to dismiss a Title VII claim. See Frith, 38 F.4th at 274 n.10. We only hold that, to the extent Waleyko relies on the Navy's allegedly disparate disciplinary treatment of female employees to indicate that his termination was motivated by his sex, such an inference finds no support in the few non-speculative allegations to that effect in his complaint.

- 10 -

completely foregoes alleging that the Navy in fact treated any of its female employees differently. Instead, the complaint attempts to tether the Navy's treatment of Waleyko to his sex by asserting, inter alia, that "a proper investigation [into the sexual harassment accusations] would have been conducted" were he a female, that "an investigation [into his emotional episode] would not have been done" were he a female, that "females would have been asked" about the missing code files, that "[n]o female would have ever been terminated based on" allegations of sexual harassment alone, that "[n]o female would have been terminated" for suggesting that she carpool with a coworker, and that Navy personnel "would never have used [an unwanted offer to carpool] to terminate a female" (emphasis added). In every comparison but two, which we address below, Waleyko's comparisons are entirely speculative and do not assert any actual disparate treatment as such a comparator analysis requires. See Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015). Rather, as his phrasing makes clear, Waleyko merely supposes that the Navy "would" treat a woman differently in the hypothetical event that one ever landed in the same situation as he did.[3] Such prognostications are precisely

---

[3] In many respects, Waleyko further undermines the plausibility of his comparator theory by affirmatively acknowledging among his allegations that some of his comparators do not exist. For example, in describing the Navy's response to Gallagher's sexual harassment accusations, Waleyko asserts that "[t]hese sorts of allegations were not made against women in

- 11 -

the "conclusory" kinds of allegations that remain in the "realm of mere conjecture" and accordingly receive no credit in evaluating a motion to dismiss. Morales-Cruz, 676 F.3d at 224 (quoting Tambone, 597 F.3d at 442); accord Smith & Wesson, 605 U.S. at --, 145 S. Ct. at 1568.

His conjectural suppositions aside, Waleyko does maintain that Nelson is a similarly situated employee whose dissimilar treatment by the Navy for her own alleged misconduct permits an inference of bias. As Waleyko alleges in his complaint, Nelson was "not discipline [sic] or terminated for false statements as a male would have been" after she made the false report about Waleyko deleting code files. He goes on to allege that "if [he], a male, had made statements to the U.S. Navy that were proven false, such as Ms. Nelson alleged against him, he would have been impacted by negative consequences, such as termination or discipline yet Ms. Nelson remains employed and was not disciplined."

This comparison is inapt, however, as the conduct that Waleyko attributes to himself and to Nelson is meaningfully

---

[C]ode 45, and allegations of this type, when they were made, were always made by women against men" (emphasis added). Similarly, with respect to the missing code files, Waleyko admits in his complaint that Nelson's report was "not the type of allegation which was ever made against females in the department" (emphasis added).

distinct. Nelson, in Waleyko's telling, knowingly lodged a false accusation against him, while Waleyko was accused of deleting the Warfare Center's code files. Waleyko does not allege that the converse of either is true -- either that he falsely accused a coworker of misconduct or that Nelson was accused of sabotaging work product. Thus, given the asymmetry of their respective conduct at issue, it follows that the Navy's reaction to each would differ, and the fact that Nelson was not "discipline[d] or terminated" in the same manner as Waleyko has no bearing on whether their disparate treatment corresponded with their sexes. See Diaz v. City of Somerville, 59 F.4th 24, 33 (1st Cir. 2023) ("For a comparison to be apt, 'apples should be compared with apples.'" (quoting Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989))).

Attempting to make a similar showing of disparate treatment with respect to the episode in which he cried in his supervisor's office, Waleyko also alleges that he "knows of numerous women who have cried at work and were not investigated for being emotionally unstable and an insider threat" as he asserts that he was. But Waleyko's allusion to "numerous women" is fatally unspecific, as he does not allege sufficient details to plausibly infer that they were similarly situated to him. Waleyko's allegation requires one to speculate whether these women were even employed at the Warfare Center, much less in the same job function

- 13 -

or under the same probationary status as Waleyko. His comparison is thus too "vague" to ground a "reasonable" inference that the Navy handled his emotional episode differently because he was a male. Morales-Cruz, 676 F.3d at 224 (quoting Tambone, 597 F.3d at 442); accord Fantini, 557 F.3d at 26.

In his only other attempt to compare the Navy's alleged disparate treatment of male and female employees, Waleyko sets forth in his complaint two apparent disparities in aggregate employment outcomes for men and women at the Warfare Center, noting that eleven out of twelve "separations from the Command" from January 1, 2021 to July 1, 2022 were by men, and that ten other employees, "most of whom were males," left "Project Harbinger" before Waleyko. But these disparities in departures, even if true, do not support a plausible inference of discrimination, as Waleyko supplies no base rate against which these aggregated numbers can be compared. Cf. Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650-51 (1989) (emphasizing that the "proper comparison" is between composition of plaintiff's group and a control group in disparate-treatment claims reliant on statistical disparities). In both cases, these figures say little to nothing about the role of the former employees' sex in their departure absent comparison to the overall gender division of the "Command" and "Project Harbinger," respectively. Without knowing what share of employees on either team were male, we cannot draw a plausible inference as

- 14 -

to whether a given number of departures from those teams was suspiciously disproportionate to the makeup of the teams themselves.[4]

**B.**

Separately, Waleyko emphasizes on appeal alleged defects in the Navy's investigative processes, essentially arguing by analogy to Menaker v. Hofstra University, 935 F.3d 20 (2d Cir. 2019), that irregularities in the Navy's procedural handling of the complaints against him were so egregious that the irregularities themselves demonstrate that his treatment was sex-based. Menaker's is inapplicable here, however, and in any event, the alleged facts of Waleyko's termination are not comparable to those of Menaker.

In Menaker, the defendant university terminated the employment of an eponymous athletic coach after he was accused of sexual harassment by a student-athlete. 935 F.3d at 27-29. Menaker sued, alleging Title VII and related state-law claims, and the district court dismissed pursuant to Rule 12(b)(6). Id. at 29. Reversing the district court, the Second Circuit held that

_____

[4] To be clear, we also do not suggest that Waleyko was obligated to present statistical proof of disparate treatment. Ames v. Ohio Dep't of Youth Servs., 605 U.S. --, --, 145 S. Ct. 1540, 1547 (2025). We merely note that Waleyko's statistically-grounded assertions supply no alternative basis on which to infer a nexus between his sex and termination.

- 15 -

Menaker had sufficiently pled a plausible Title VII case by alleging facts that "reflect a clearly irregular investigative and adjudicative process" prior to his termination. Id. at 34. In particular, the Second Circuit highlighted three types of irregularities in Menaker's termination that plausibly showed the university's bias: (1) the university's failure to interview witnesses supplied by Menaker; (2) university officials' express acknowledgment that the evidence weighed against his termination; and (3) university officials' significant deviation from written university policies and procedures for adjudicating his termination. Id. at 34-35. The Second Circuit concluded that Menaker's termination "under such circumstances strongly suggests the presence of bias." Id. at 35.

In our only case to consider Menaker, however, we did not adopt its reasoning as an alternative to the causal nexus requirement, as "procedural errors are not inevitably a sign of sex bias." Doe v. Stonehill Coll., Inc., 55 F.4th 302, 334 (1st Cir. 2022).[5] Rather, a plaintiff alleging that procedural irregularities in a defendant's investigative practices demonstrate its discriminatory animus must still allege how the

_____

[5] While we considered Menaker in the Title IX context in Stonehill College, see 55 F.4th at 334, Stonehill's reasoning applies with equal force here, as the relevant standards governing sex-based discrimination claims under Title VII and Title IX are the same. Ing v. Tufts Univ., 81 F.4th 77, 82 (1st Cir. 2023).

- 16 -

"proceedings [were] plausibly affected by sex bias" and are not attributable to "other plausible reasons" like "ineptitude, inexperience, and sex-neutral pro-complainant bias." Id. (third quoting Doe v. Samford Univ., 29 F.4th 675, 692 (11th Cir. 2022)). Thus, Waleyko must not only allege that the Navy's disciplinary processes were deficient; he must allege concrete facts supporting a plausible inference that said deficiencies were caused by the Navy's anti-male bias. He does not.

Here, Waleyko rests much of his argument about the Navy's procedural deficiencies on its continued investigation of the Warfare Center's missing code files after they were located. But the Navy's continued investigation into a report of missing code files, even if since resolved as Waleyko contends and therefore "considered in the light most favorable to" him, is readily susceptible to several "obvious alternative explanation[s]." Frith, 38 F.4th at 275 (second quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 9 (1st Cir. 2011)). For example, given the obvious sensitivity of its weapons-related work, the Navy has a strong interest in understanding the impetus for Nelson's report that files related to that work were interfered with, even if they were not, to ensure that such a mistake does not recur. Gaining that understanding could reasonably require undertaking certain investigative measures, such as interviewing Waleyko, the subject of the false report.

- 17 -

Likewise, with respect to the sexual harassment investigation, Waleyko's account is itself internally inconsistent, as he both alleges that "he was never told what exactly was being alleged against him" and was "never . . . asked any questions as to Gallagher's allegations" yet also recounts one or more meetings with his supervisor about Gallagher's accusations in which he "became aware" of their substance and was "asked . . . about his past interactions with Ms. Gallagher" and "if he had forced Ms. Gallagher to carpool with him." Given his own acknowledgments in the complaint that he participated in an investigation, Waleyko's allegation that one never took place is inherently implausible, much less his assertion that there was no investigation because of the Navy's discriminatory animus.

Moreover, even if we adopted without reservation the per se rule that Waleyko purports to glean from Menaker, the Navy's investigations here -- even as Waleyko characterizes them -- do not share the irregularities that the Second Circuit said were indicative of bias in Menaker. First, Waleyko expressly concedes that none of the procedural irregularities he alleges are "directly related to a written policy of the Defendant," whereas the defendant university in Menaker had flatly abandoned its applicable policies. See 935 F.3d at 36. Second, while Waleyko now complains that the Navy's investigation into Gallagher's accusations against him was not exhaustive, he concedes that he

- 18 -

was interviewed by Navy personnel about both his interactions with Gallagher and about the missing code files, and he does not allege that the Navy declined to interview other witnesses that he requested. Rather, he alleges that other witnesses exist who were not interviewed, but not, notably, that the Navy knew of them as potential witnesses and declined to do so as the defendant did in Menaker. See id. at 34. And third, nowhere in his complaint does Waleyko allege that any Navy officials knew that the evidence counseled against his termination like in Menaker. See id. Waleyko seemingly attempts to characterize the Navy as demonstrating the same willful ignorance by noting that another employee "easily found the files and ran the code" after "he heard about" the related accusation against Waleyko. But Waleyko does not allege that this employee had any contact with those responsible for investigating the accusation, nor does his complaint clearly allege that those responsible for his termination knew of that employee's successful location of the code at the time that they interviewed Waleyko. Thus, Waleyko's allegations are distinguishable from those in Menaker, as they do not reveal any affirmative effort by the Navy to impair or contradict its own investigation.

## C.

Finally, Waleyko attempts to cast his challenge as a gender-stereotyping claim, asserting that all the labels he

- 19 -

alleges being assigned by Navy personnel -- "sexual harasser, stalker, [having] an 'active shooter' vibe, . . . code stealer, and . . . insider threat within a military environment" -- are typically associated with men. However, "terms that convey only gender-neutral meanings are insufficient to anchor a gender-stereotyping claim," particularly when "the supposed stereotype of which the plaintiff complains is not one that, by common knowledge or widely shared perception, is understood to be attributable to" the plaintiff's gender. Morales-Cruz, 676 F.3d at 225. Here, all the labels that Waleyko references in his complaint are gender-neutral. Moreover, we know of no legal authority recognizing commonly held stereotypes of men as more likely to "steal[]" "code" or pose an "insider threat within a military environment" as Waleyko construes them. In sum, Waleyko's complaint critically fails to allege any gender-based stereotype on which the Navy acted in asking him to resign from his probationary position, foreclosing a gender-stereotyping claim.

**III.**

For the foregoing reasons, we **affirm**.