18-3089-cv
*Menaker v. Hofstra Univ.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2018

No. 18-3089-cv

JEFFREY MENAKER,
*Plaintiff-Appellant*,

v.

HOFSTRA UNIVERSITY,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Eastern District of New York

ARGUED: MAY 14, 2019
DECIDED: AUGUST 15, 2019

Before: CABRANES, HALL, *Circuit Judges,* and STANCEU, *Judge.* *

Plaintiff-Appellant Jeffrey Menaker ("Menaker") appeals from a September 27, 2018 judgment of the United States District Court for the Eastern District of New York (Denis R. Hurley, *Judge*) dismissing his complaint for failure to state a claim. Menaker sued Defendant-Appellee Hofstra University ("Hofstra") pursuant to Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law, alleging that Hofstra discriminated against him because of his sex when it fired him in response to allegedly malicious allegations of sexual harassment. The District Court dismissed Menaker's claim pursuant to Federal Rule of Civil Procedure 12(b)(6). We conclude that the District Court's decision conflicts with our precedent in *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), and relies on improper factual findings. We also conclude that, on remand, the District Court should consider Hofstra's potential liability under a "cat's paw" theory. Accordingly, we **VACATE** the judgment and **REMAND** the cause to the District Court for further proceedings consistent with this opinion.

<div style="margin-left:40%">

STEPHEN D. HOUCK (Theodor D. Bruening, *on the brief*), Offit Kurman, P.A., New York, NY, *for Plaintiff-Appellant*.

</div>

---

* Chief Judge Timothy C. Stanceu, of the United States Court of International Trade, sitting by designation.

JILL GOLDBERG, Orrick, Herrington & Sutcliffe LLP, New York, NY, *for Defendant-Appellee.*

———————

JOSÉ A. CABRANES, *Circuit Judge*:

When universities design and implement polices to ensure the security of their students, they facilitate their sacred mission of educating the next generation. But when they distort and deviate from those policies, fearfully deferring to invidious stereotypes and crediting malicious accusations, they may violate the law.

Plaintiff-Appellant Jeffrey Menaker ("Menaker") appeals from a September 27, 2018 judgment of the United States District Court for the Eastern District of New York (Denis R. Hurley, *Judge*) dismissing his complaint for failure to state a claim. Menaker sued Defendant-Appellee Hofstra University ("Hofstra" or "the University") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law, alleging that Hofstra discriminated against him because of his sex when it fired him in response to allegedly malicious allegations of sexual harassment. The District Court dismissed Menaker's claim pursuant to Federal Rule of Civil Procedure 12(b)(6). We conclude that the District Court's decision conflicts with our precedent in *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016) ("*Doe v. Columbia*"), and relies on improper factual findings. We also conclude that, on remand, the District Court should consider Hofstra's potential liability under a "cat's paw" theory.

3

Accordingly, we **VACATE** the judgment and **REMAND** the cause to the District Court for further proceedings consistent with this opinion.

## I.    BACKGROUND

The following facts are drawn from Menaker's Amended Complaint and documents incorporated by reference therein. In recounting the facts, we are, of course, required to "accept as true all of the factual allegations contained in the complaint."[1]

### A. The Atmosphere at Hofstra

The events at issue occurred against a general background of debate and criticism concerning the handling of allegations of sexual harassment and misconduct by American universities, including Hofstra. In 2011, the U.S. Department of Education issued a now-famous "Dear Colleague" letter to colleges and universities.[2] The "Dear Colleague" letter "ushered in a more rigorous approach to campus sexual misconduct allegations" by defining "'sexual harassment' more broadly than in comparable contexts" and  requiring that "schools prioritize the investigation and resolution

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (citation omitted). To be clear, we evince no views concerning whether the "facts" we detail below are *actually* true. Our task is limited to determining whether, *if* Menaker's allegations were true, they would state a Title VII sex-discrimination claim.

[2] *See* Office of the Assistant Sec'y for Civil Rights, "Dear Colleague" Letter, U.S.    DEP'T    OF    EDUC.    (Apr.    4,    2011), https://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html.

of harassment claims" and adopt a lower burden of proof when adjudicating claims of sexual misconduct.[3]

By May 2015, the national press had identified Hofstra as one of several universities under investigation by the Department of Education for possible mishandling of sexual misconduct claims. At the same time, Hofstra also faced internal criticism for its assertedly inadequate response to male sexual misconduct on campus.[4]

### B. A Dispute Over an Athletic Scholarship

On January 15, 2016, Menaker joined Hofstra as its Director of Tennis and Head Coach of both its men's and women's varsity tennis teams. In late April 2016, Michal Kaplan,[5] then a first-year student at Hofstra and a member of the women's varsity tennis team, approached Menaker to discuss her athletic scholarship. Kaplan claimed that Menaker's predecessor had promised to increase her then-45 percent athletic scholarship to a full scholarship in the fall of 2016. Kaplan sought confirmation from Menaker about her scholarship increase, but Menaker explained that he knew nothing about the arrangement and would need to look into the matter.

---

[3] *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019).

[4] App. 111 (Am. Compl. ¶ 51).

[5] Although Kaplan's name was omitted from the pleadings in this case, she has since agreed to proceed under her own name in a related suit, thereby rendering moot the continued use of a pseudonym in this case. *See Menaker v. Kaplan*, No. 2:17 Civ. 5840 (DRH) (AYS) (E.D.N.Y. filed Oct. 5, 2017), Dkt. Nos. 40-41.

After reviewing Kaplan's financial aid records and speaking with his supervisor, Menaker confirmed there was no record of any such promise. He informed Kaplan of this, but Kaplan insisted that she had received an oral promise from Menaker's predecessor. Menaker responded that he was unable to increase Kaplan's scholarship for the coming year (Kaplan's sophomore year) but could do so for her junior and senior years. Kaplan stated that she would inform her parents, and Menaker replied that they should feel free to call him with any questions.

In early May 2016, Menaker received an irate phone call from Kaplan's father, who accused him of reneging on a commitment made by his predecessor. Kaplan's father threatened Menaker that if he did not increase his daughter's scholarship, trouble would "come back to him."[6]

### C. *Kaplan Files a Title IX Complaint Against Menaker*

In late July 2016, Hofstra received a letter addressed to the university's President and its Title IX Coordinator, titled "Michal Kaplan's Title IX Complaint" (the "Kaplan Letter").[7] The Kaplan

---

[6] App. 100 (Am. Compl. ¶ 11) (brackets omitted).

[7] App. 117–120. We consider the full contents of the Kaplan Letter, including those portions not specifically quoted in the Amended Complaint, because a "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner*, 282 F.3d 147, 152 (2d Cir. 2002*)* (citation omitted). We do not, however, consider extrinsic materials referenced in the Kaplan Letter (*e.g.*, screenshots of Facebook postings and Youtube videos), despite their inclusion in the Appendix.

Letter, sent by Kaplan's lawyer, alleges that Menaker subjected her to "unwanted and unwarranted sexual harassment" and "quid pro quo threats [that] were severe, pervasive, hostile, and disgusting."[8] In particular, the letter alleges that Menaker was "obsess[ed] with" and would comment on Kaplan's menstrual cycle, that he would tell players to "dress nice" and "shave their legs," that he once "scream[ed] obscenities and verbal abuse at a female tennis player on the opposing team," and that after Kaplan "did not respond to [Menaker's] advances, [he] soon began to threaten [her]" scholarship and position on the team.[9] Menaker maintains that each of these allegations is false.[10]

---

As we have explained, "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.* at 153 (emphasis in original). Menaker's Amended Complaint does not rely on these extrinsic materials.

[8] App. 117, 119.

[9] *Id.* at 117–19 (internal quotation marks omitted).

[10] The Kaplan Letter also describes (and characterizes as sexual harassment) three interactions on the social media website Facebook. These alleged interactions are: (1) that Menaker "friended" Kaplan on Facebook in January 2016; (2) that at 12:30 a.m. on Valentine's Day, Menaker "commented" on a photograph of Kaplan wearing a hunting jacket and standing in front of a "large red LOVE statue in New York City" with the following: "Looks like you found what you were hunting for in that jacket," followed by a "winking emoji face"; and (3) that Menaker "messaged" Kaplan on April 6, 2016 with a link to a satirical YouTube video entitled "Casually Explained: Is She Into You?" *Id.* at 117–18. The video depicts cartoons in different scenarios as a narrator explains how you can tell if the girl is "into you." *Id.* Although Menaker does not specifically discuss these allegations in

*D. The July 2016 Meeting with Hofstra Officials*

Shortly after receiving the July 2016 Kaplan Letter, Hofstra's Deputy General Counsel, Jennifer Mone ("Mone"), and its Vice President and Director of Athletics, Jeffrey Hathaway ("Hathaway"), summoned Menaker to a meeting. Menaker was not informed of the reason for the meeting in advance. Mone, who appeared to be referring to a document in front of her, began by asking Menaker how he communicated with members of the tennis program. Menaker responded that he used several forms of electronic communication as, he claims, is standard in athletic programs.

As Mone's questioning continued, Menaker asked to see the document. Mone handed him the Kaplan Letter. After reading the letter, Menaker verbally denied all of the accusations contained therein. Hathaway, who was also present, joined Menaker in vigorously disputing a particular accusation that Hathaway knew to be false. Mone instructed Menaker to collect copies of all

his Amended Complaint, he has "denied all the accusations contained in the Letter . . . as false, taken out of context, and misleading." *Id.* at 104 (Am. Compl. ¶ 27).

Of course, nothing in this opinion should be interpreted as limiting an employer's ability to terminate an at-will employee for general, non-discriminatory reasons—including disapproved use of social media. As alleged, however, the circumstances of Menaker's termination do not simply consist of an employer's generic disapproval of Menaker's social media use. Rather, Menaker was expressly terminated because of allegations made in a formal sexual harassment complaint and despite Hofstra's adoption of formal procedures for such complaints.

communications with Kaplan and informed him that Hofstra would be conducting an investigation into the matter and that a report would soon be "shared" with him.[11]

At the time, Hofstra maintained a written "Harassment Policy," which "covers the conduct of all University employees and students" and outlines proper procedures for investigating and resolving harassment claims.[12] The Harassment Policy provides for both an "informal" process for pursuing a "mutually agreeable" resolution and "formal" procedures. The latter procedures include requirements that Hofstra's investigator interview potential witnesses, that accused parties have the right to submit a written response, and that Hofstra's investigator produce a written determination of reasonable cause.[13]

E. *July and August 2016: Menaker Waits for Hofstra to Take Action*

Over the following two months, Menaker provided Hofstra copies of his communications with Kaplan. He pointed out that "the time frames described in [the Kaplan Letter] were provably false,"[14] and he suggested names of particular student-athletes who could provide information that might be useful to the investigation. Hofstra

---

[11] *Id.* (Am. Compl. ¶ 28).

[12] *Id.* at 122.

[13] *Id.* at 127–29.

[14] *Id.* at 104 (Am. Compl. ¶ 30).

made no further requests from Menaker and did not interview the students he identified.

During this same period, Hathaway told Menaker that he assumed the complaint to be a ploy by Kaplan's parents, and that complaints such as Kaplan's were not uncommon.

Meanwhile, Menaker retained counsel, who contacted Mone. Mone advised Menaker's counsel to refrain from taking legal action against Kaplan and promised to keep him informed of the investigation's status.

*F. The September 2016 Meeting: Menaker is Fired*

On September 7, 2016, Menaker was summoned to a meeting with Hofstra's Director of Human Resources, Evelyn Miller-Suber ("Miller-Suber"), Mone, and Hathaway. As with the July meeting, Menaker was not given advance notice of the purpose of the meeting and did not have an opportunity to prepare for it.

Mone opened the meeting by recalling the Kaplan Letter and repeating several of its allegations. Mone also added a new allegation, namely that Menaker had "made statements to students about his divorce."[15] After completing her statement, Mone left the room, and Miller-Suber informed Menaker that he was being fired for

---

[15] *Id.* at 107 (Am. Compl. ¶ 42).

10

"unprofessional conduct."[16] She added that, while none of the stated allegations was independently sufficient for termination, he was nevertheless being fired for the "totality" of the allegations.[17]

### G. The Proceedings Below

On March 6, 2017, Menaker filed a charge of sex-based discrimination with the United States Equal Opportunity Commission, and, on May 30, 2017, the Commission issued a Notice of Right to Sue letter. On September 22, 2017, Menaker filed suit, alleging violations of Title VII, the New York State Human Rights Law, and New York City Human Rights Law.[18] On January 12, 2018, Hofstra filed a motion to dismiss the case under Federal Rule of Civil Procedure 12(b)(6). On September 26, 2018, the District Court granted the motion, concluding that Menaker had failed to plead facts supporting a plausible inference that his sex played a role in his termination. This appeal followed.

---

[16] *Id.* (Am. Compl. ¶ 43) (internal quotation marks omitted).

[17] *Id.*

[18] *See* 42 U.S.C. § 2000e *et seq.*, N.Y. Exec. Law § 296, and N.Y.C. Code § 8-101, respectively.

## II.    DISCUSSION

### A.  Standard of Review

We review *de novo* a district court's order granting a motion to dismiss.[19] We accept all factual allegations in the Amended Complaint as true and draw all inferences in Menaker's favor.[20] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[21]

### B.  Title VII Claims Generally

Title VII prohibits an employer from "taking an adverse employment action" against an individual "because of such individual's race, color, religion, sex, or national origin."[22] Because it is often difficult to obtain direct evidence of discriminatory intent, we employ a "burden-shifting framework" (commonly identified by reference to the Supreme Court case from which it derives, *McDonnell*

---

[19] *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).

[20] *See id.*

[21] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). *See* note 1, *ante*, and accompanying text.

[22] *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)).

*Douglas Corp. v. Green*)[23] to "progressively sharpen[ ] the inquiry into the elusive factual question of intentional discrimination."[24]

To survive a motion to dismiss, a plaintiff need only establish "a *prima facie* case of sex discrimination by demonstrating that (1) [he] was within the protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."[25] If a plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer at the summary judgment stage "to articulate some legitimate, nondiscriminatory reason for the adverse employment action."[26] Finally, if the employer carries that burden, a plaintiff must submit admissible evidence from which a finder of fact could "infer that the defendant's employment decision was more likely than not based in whole or in part

---

[23] 411 U.S. 792 (1973); *see also Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016) ("Claims of sex-based discrimination under Title VII and the NYHRL are analyzed using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green . . . .*").

[24] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citation and ellipses omitted).

[25] *Walsh*, 828 F.3d at 75 (citation omitted); *see also Littlejohn*, 795 F.3d at 311 (explaining that because the submission of a complaint "by definition . . . occurs in the first stage of the litigation," a "plaintiff cannot reasonably be required to allege more facts in the complaint than [he] would need to defeat a motion for summary judgment made prior to the defendant's furnishing of a non-discriminatory justification").

[26] *Id.* (citation omitted).

on discrimination."[27] The burden-shifting framework thus "reduces the facts needed to be pleaded under *Iqbal*" at the 12(b)(6) stage of a Title VII suit.[28] A plaintiff need only allege facts that give "plausible support to a minimal inference of discriminatory motivation."[29]

Here, there is no dispute that Menaker's Amended Complaint satisfies the first three elements of a *prima facie* case.[30] Thus the only remaining question is whether the complaint alleges circumstances that provide at least minimal support for an inference of discriminatory intent. We conclude that it does. As explained below, the District Court's conclusion to the contrary stems in part from its failure to appreciate the scope of our precedent in *Doe v. Columbia*. The District Court also failed to draw all reasonable inferences in Menaker's favor, relying instead on impermissible factual findings. Finally, on remand, the District Court should also consider whether Kaplan's discriminatory intent could be imputed to Hofstra through a "cat's paw" theory of vicarious liability.

---

[27] *Id.* (citation omitted).

[28] *Littlejohn*, 795 F.3d at 310 (2d Cir. 2015).

[29] *Id*. at 311.

[30] *Menaker v. Hofstra Univ.*, No. 2:17 Civ. 5562 (DRH) (AYS), 2018 WL 4636818, at *3 (E.D.N.Y. Sept. 26, 2018) ("[T]here is no dispute . . . that Plaintiff belongs to a protected class, that he was qualified for the position he held, and that he suffered an adverse employment action.").

*C. The Proper Scope of* Doe v. Columbia

In *Doe v. Columbia*, a male student alleged that his suspension for sexual assault was motivated, in part, by improper consideration of his sex in violation of Title IX of the Education Amendment of 1972 ("Title IX").[31] Similar to Title VII, Title IX prohibits discrimination "on the basis of sex."[32] But unlike Title VII, which prohibits employment discrimination, Title IX applies to "any education program or activity receiving Federal financial assistance."[33] We have, however, long interpreted Title IX "by looking to the . . . the caselaw interpreting Title VII," and we have therefore held that "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."[34]

The plaintiff in *Doe v. Columbia* advanced precisely such a claim. His complaint alleged an atmosphere of public pressure demanding that the university react more swiftly and severely to female complaints of sexual assault against males. The complaint also alleged substantial procedural irregularities in the investigation and adjudication of the accusations against the student. These irregularities included: the university's failure "to seek out potential witnesses [he] had identified as sources of information favorable to

---

[31] *Doe v. Columbia*, 831 F.3d at 48.

[32] 20 U.S.C. § 1681.

[33] *Id.*

[34] *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714–15 (2d Cir. 1994).

him," its failure "to act in accordance with University procedures designed to protect accused students," and its arrival at conclusions that were "incorrect and contrary to the weight of the evidence."[35]

We concluded that the complaint successfully stated a claim for sex discrimination under Title IX. In so holding, we highlighted two factual allegations that plausibly supported "at least the needed minimal inference of sex bias."[36] First, we recognized that the procedural deficiencies in the university's investigation and adjudication of the sexual assault complaint raised an inference that the university was motivated, at least in part, by bias.[37] Next, we confirmed that this bias was likely a sex-based bias by noting that the university had been criticized for "not taking seriously complaints of *female* students alleging sexual assault by *male* students."[38] We reasoned that it was plausible that the university was motivated to "favor the accusing female over the accused male" in order to

---

[35] *Doe v. Columbia*, 831 F.3d at 56–57.

[36] *Id.* at 59.

[37] *Id.* at 57.

[38] *Id.* (emphasis added). We emphasized that a plaintiff seeking to survive a motion to dismiss need not establish a *necessary* inference of sex-based discrimination, or even that such discrimination be "*the most plausible* explanation of the defendant's conduct." *Id.* (emphasis in original). Rather, it is sufficient if the inference of sex-based discriminatory intent is one of several possible inferences.

demonstrate its commitment to protecting female students from male sexual assailants.[39]

In this case, the District Court placed several unwarranted limitations on the application of *Doe v. Columbia*. First, the District Court interpreted *Doe v. Columbia* as applying only to plaintiffs accused of sexual assault, rather than those accused of sexual harassment.[40] Second, the District Court limited *Doe v. Columbia* to student plaintiffs, to the exclusion of employee plaintiffs.[41] And third, the District Court assumed that the logic of *Doe v. Columbia* was confined to circumstances where criticism of a university had reached a "crescendo."[42] We disagree with these overly narrow interpretations of our precedent.

---

[39] *Id.*; *see also id.* at 58 n.11 ("A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.").

[40] *Menaker*, 2018 WL 4636818, at *4 ("[T]he facts in this case are distinguishable from those in *Doe*. First, *Doe* concerned accusations of . . . sexual assault, not harassment and unprofessional conduct . . . .").

[41] *Id.* (distinguishing between accusations of "student-on-student" sexual misconduct and accusations of sexual misconduct "by an at-will employee against students on his team and other teams").

[42] *Id.* at *5.

First, we reject the District Court's attempt to distinguish between accusations of sexual assault on the one hand, and accusations of sexual harassment on the other. The logic of *Doe v. Columbia* applies equally to both sorts of accusations. The intuitive principle that universities' reactions to accusations of sexual misconduct are often influenced by the sexes of the parties applies with equal force to both sexual assault and sexual harassment. A plaintiff may thus establish a *prima facie* case for sex discrimination based on adverse actions for both allegations of sexual harassment and allegations of sexual assault.

Second, we emphasize that the holding of *Doe v. Columbia* is not limited to Title IX claims rather than Title VII claims. We apply similar principles in both Title VII and Title IX when seeking to identify discriminatory intent.[43] Indeed, our holding in *Doe v. Columbia* was expressly based on Title VII principles.[44] Nor is the logic underlying *Doe v. Columbia* limited to discipline meted out in response to allegations of student-on-student misconduct. On the contrary, the very same pressures that may drive a university to discriminate against male *students* accused of sexual misconduct may drive a university to discriminate against male *employees* accused of the same.

---

[43] *See, e.g.*, *Yusuf*, 35 F.3d at 714 ("[C]ourts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII.").

[44] *Doe v. Columbia*, 831 F.3d at 55 ("[R]ules the Supreme Court established for Title VII litigation appear to apply also to such similar claims of sex discrimination under Title IX.").

18

To be sure, an at-will employee may have different *contractual* rights than a student or a tenured faculty member. And a university may well have reasons other than sex for distinct treatment of claims affecting these different sorts of members of a university community. But once a university has promised procedural protections to employees, the disregard or abuse of those procedures may raise an inference of bias.[45]

Third, we reject the District Court's attempt to limit *Doe v. Columbia* to cases where the public pressure on a university is

---

[45] Apart from an inference of bias, a university's disregard of promised procedural protections may also give rise to claims for breach of contract or for violations of state law guarantees of procedural or substantive fairness. *See, e.g.*, *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 592–93 (1996) ("[C]ourts will entertain a cause of action for institutional breach of a contract for educational services . . . if the educational institution failed to fulfil a specific contractual promise distinct from any overall obligation to offer a reasonable program."); *Neiman v. Yale Univ.*, 270 Conn. 244, 251 (2004) (concluding that "the trial court properly determined that a contract existed [based on a faculty handbook] as a matter of law"); *Powers v. St. John's Univ. Sch. of Law*, 25 N.Y.3d 210, 216 (2015) (permitting judicial review where a university "acts arbitrarily and not in the exercise of its honest discretion [or] fails to abide by its own rules"); *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 660 (1980) ("[W]e hold that when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that procedure must be substantially observed."); *Olsson v. Bd. of Higher Ed.*, 49 N.Y.2d 408, 414 (1980) ("[A]n academic institution must act in good faith in its dealings with its students."). Because Menaker did not pursue any such claims, we do not consider them here.

19

particularly acute.[46] We agree that "[p]ress coverage of sexual assault at a university does not automatically give rise to an inference that a male who is terminated because of allegations of inappropriate or unprofessional conduct is the victim of [sex] discrimination."[47] But this does not mean that the press coverage or public pressure must reach a particular level of severity. On the contrary, when combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination.[48]

To summarize: we decline to adopt each of the District Court's proposed limitations on *Doe v. Columbia*. The logic of that precedent applies to both students and employees, to accusations of sexual harassment as well as sexual assault, and it does not rely on a particular quantum of criticism at a specific university. Rather, *Doe v. Columbia* stands for the general principle that where a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting

---

[46] *Menaker*, 2018 WL 4636818, at *5 (describing the criticism in *Doe v. Columbia* as "a crescendo of articles about sexual assault and harassment at Columbia University in particular").

[47] *Id.*

[48] It is precisely because procedural irregularity alone *already* suggests bias that even minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex. *See* notes 37–38 and accompanying text, *ante*.

20

inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a *prima facie* case of sex discrimination.

Here, Menaker has clearly alleged that he suffered an adverse employment action, and that this action came in response to accusations (if not an actual finding) of sexual harassment. Similarly, Menaker has plausibly alleged facts that suggest at least *some* pressure on Hofstra to react more forcefully to allegations of male sexual misconduct (*e.g.*, the "Dear Colleague" Letter, a Department of Education investigation, and student criticism).[49] The only remaining question, then, is whether his firing followed a sufficiently irregular process to raise an inference of bias.

### D. Procedural Irregularities

To decide the instant case, we need not define precisely what sort of irregularities meet the standard of "clearly irregular investigative or adjudicative process."[50] But we note that *Doe v.*

---

[49] *See* notes 2–4 and accompanying text, *ante.*

[50] In recognizing that a clearly irregular investigative or adjudicative process may (when combined with other factors) create a plausible inference of sex discrimination, we do not, of course, incorporate the Due Process Clause of the Fourteenth Amendment into the employment decisions of *private* universities. *Cf. Faghri v. Univ. of Conn.*, 621 F.3d 92, 99 (2d Cir. 2010) (analyzing the demotion of a professor at a public university under the Due Process Clause). As with our Due Process Clause jurisprudence, however, what constitutes "clearly irregular process" depends on context. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 481 ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."). The standard will vary based on the size of the employer, the

*Columbia* offers some guidance on this issue. For instance, "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias."[51] Similarly, where decision-makers choose "to accept an unsupported accusatory version over [that of the accused], and declined even to explore the testimony of [the accused's] witnesses," this too "gives plausible support to the proposition that they were motivated by bias."[52]

Here, Menaker has pleaded facts that, when taken as true, reflect a clearly irregular investigative and adjudicative process. First, Menaker alleges that Hofstra failed to interview relevant witnesses whom he brought to the University's attention.[53] Second, Menaker alleges that he was terminated despite the fact that Hofstra Vice President Jefferey Hathaway *knew* that at least one of the accusations

---

nature of the accusation, and the expectations of the parties. Moreover, we emphasize that our standard requires *clear* irregularities to raise an inference of bias. Variations among employers, even among universities, are expected, and minimal irregularities (absent other indicia of bias) do not suffice to suggest discrimination.

[51] *Doe v. Columbia*, 831 F.3d at 57.

[52] *Id.*

[53] App. 105, 106 (Am. Compl. ¶¶ 32, 39).

against him was false and believed the complaint to be a "ploy."[54] Similarly, Menaker alleges that his supervisor was aware of Kaplan's frustration regarding her scholarship and her attempts to manipulate the athletic department in the spring of 2016.[55] Third, despite Mone's express promise that Menaker would receive a report based on Hofstra's investigation, Menaker received no such report.[56]

Fourth, Menaker alleges that Hofstra completely disregarded the process provided for in its written "Harassment Policy." The Policy provides for a "Formal Procedure," which requires that Hofstra interview potential witnesses, provide respondents the opportunity to submit a written response, and produce a written determination of reasonable cause.[57] Menaker claims that he received none of these procedural protections.[58] Thus, as with the allegations in *Doe v. Columbia*, Hofstra's termination of Menaker under such circumstances strongly suggests the presence of bias.

The District Court sought to minimize or explain away these clear procedural irregularities. In doing so, however, it failed to draw

---

[54] *Id.* at 104 (Am. Compl. ¶¶ 27, 29).

[55] *Id.* at 99–101 (Am. Compl. ¶¶ 9, 12, 14–16).

[56] *Id.* at 104, 109 (Am. Compl. ¶¶ 28, 48).

[57] *Id.* at 106, 108 (Am. Compl. ¶¶ 36, 45–46), 128–129.

[58] *Id.* at 109 (Am. Compl. ¶ 48).

all reasonable inferences in Menaker's favor and made improper findings of fact.

First, the District Court observed that Menaker "never allege[d] that Mone, Hathaway or Miller[-Suber] were hostile to him."[59] The District Court therefore concluded that "Mone[], Hathaway, and Miller[-Suber] were nothing but professional and level-headed in all of their interactions with Plaintiff."[60] This was error for two reasons. Not only did the District Court draw an affirmative conclusion—the absence of hostility by Hofstra officials—from an apparent omission, but Menaker's Amended Complaint expressly alleges that Mone "questioned [him] in a hostile manner."[61]   Thus, the District Court's factual conclusion to the contrary was erroneous and impermissible.[62]

Further, the District Court concluded that Menaker's allegations "suggest that Defendant comported with the 'Informal Procedure'" included in the Hofstra Harassment Policy.[63] This is clearly incorrect. The Policy expressly states that the "Informal Procedure" reflects an attempt to reach "a mutually agreeable solution" and a process to

---

[59] *Menaker*, 2018 WL 4636818, at *4.

[60] *Id.*

[61] App. 102 (Am. Compl. ¶ 22).

[62] *Littlejohn*, 795 F.3d at 319.

[63] *Menaker*, 2018 WL 4636818, at *4.

"resolve or 'work out' the issue in a non-adversarial manner."[64] The result of such a procedure must be "acceptable to both parties in interest."[65] Here, Hofstra "resolved" the dispute by firing Menaker—a result certainly not agreed to or accepted by Menaker. This process did not, therefore, comport even with Hofstra's "Informal Procedures."

Next, the District Court concluded that there was nothing irregular about Hofstra's failure to comport with its written "Harassment Policy" because "in Plaintiff's own words, he was fired for 'unprofessional conduct'—not harassment."[66] This is doubly incorrect. First, Menaker *directly disputes* that he was fired for "unprofessional conduct." To the contrary, he maintains that he was fired due to Hofstra's discriminatory adjudication of a harassment complaint against him, and that this post-hoc allegation of "unprofessional conduct" was merely pretextual.[67] Second, in the same paragraph of the Amended Complaint where Menaker states that Miller-Suber informed him that he was being fired for "unprofessional conduct," he also alleges that he was told that his

---

[64] App. 126, 128.

[65] *Id.* at 128.

[66] *Menaker*, 2018 WL 4636818, at *4.

[67] App. 107 (Am. Compl. ¶ 44) ("In view of the complete lack of merit in the charges and the evident absence of a proper investigation in accordance with Hofstra's own written procedures and policies, it is clear that Plaintiff's employment was terminated as a result of raw bias against Plaintiff based on his gender.").

25

employment was being terminated based on the "'totality' of the allegations."[68] Thus, even if "unprofessional conduct" was one reason he was fired, the Amended Complaint alleges that there were other reasons as well.

Even were we to accept at face value Hofstra's assertion that the termination was based solely on a determination that Menaker engaged in "unprofessional conduct" (which we may not[69]), Hofstra's abandonment of its written Harassment Policy here would *still* be irregular. After all, Hofstra's conclusion that Menaker had engaged in "unprofessional conduct" derives from—and simply recharacterizes—the sexual harassment accusations in the Kaplan Letter. To wit: Mone began the September meeting by telling Menaker, "[y]ou are aware that there is a complaint against you" and repeating the very accusations contained in the Kaplan Letter.[70] Similarly, Miller-Suber informed him he was being fired based on the "totality" of these same allegations.[71]

Hofstra nevertheless insists that, regardless of the offense of which Menaker was *accused*, the Harassment Policy did not apply because he was *ultimately found responsible* for "unprofessional

---

[68] *Id*. (Am. Compl. ¶ 43).

[69] *Littlejohn*, 795 F.3d at 306 (requiring courts to evaluate the sufficiency of a complaint by drawing all reasonable inferences in the plaintiff's favor).

[70] App. 107 (Am. Compl. ¶ 41).

[71] *Id.* (Am. Compl. ¶ 43).

conduct" rather than "harassment." In other words, Hofstra argues that Menaker had no right to the Policy's procedural protections because he was not found guilty of the accusations. To state the argument is to demonstrate its absurdity.

It is also contrary to the written terms of the Harassment Policy. The Harassment Policy applies to "complaints alleging harassment."[72] Kaplan's Title IX complaint, which triggered Hofstra's inquiry and led to Menaker's termination, expressly alleges "sexual harassment violations."[73] Therefore, the Policy applies—regardless of how the University chooses to characterize its ultimate findings. [74]

Finally, Hofstra's interpretation defies common sense. Procedural protections safeguard the rights of the accused during the investigative and adjudicative process. One cannot, therefore, wait until after that process has concluded to determine (based on its result) whether these protections apply. Any argument to the contrary is

---

[72] *Id.* at 125.

[73] *Id.* at 117.

[74] Insofar as Hofstra's argument is that the Harassment Policy did not apply because Hofstra knew Menaker was not guilty of harassment even *before* conducting an investigation, this does not help Hofstra's case. At the very least, this would amount to an admission that Hofstra used harassment allegations it knew to be false or exaggerated as the occasion for a general review of Menaker's work performance. Whether such an account of Hofstra's conduct is persuasive—or would overcome the discriminatory taint of being triggered by malicious sexual harassment allegations—are questions for subsequent stages of this litigation, not at the stage of a motion to dismiss.

reminiscent of the philosophy of Lewis Carroll's Queen of Hearts: "Sentence first—verdict afterwards."[75] This is the opposite of procedural regularity.

An employer cannot escape its promise of procedural protections by recharacterizing accusations of sexual misconduct in more generic terms. Nor can it deny an inference of procedural irregularity through post-hoc rationalization. Menaker has therefore alleged sufficient facts to suggest procedural irregularity and, together with other facts, a *prima facie* case of sex discrimination.

### E. Imputing an Agent's Discriminatory Intent

Although Menaker relied principally on *Doe v. Columbia* in arguing for the sufficiency of his complaint,[76] he argues, additionally, that the facts he has pleaded also lend themselves to analysis under what is essentially a "cat's paw" theory.[77] On remand, the District

---

[75] Lewis Carroll, *Alice's Adventures In Wonderland*, 154 (Broadview Press, Ed. Richard Kelly 2004) (1865).

[76] While arguments not presented to the district court "generally will not be considered for the first time on appeal," we have broad discretion to consider such arguments "because our waiver and forfeiture doctrine is entirely prudential." *United States v. Gomez*, 877 F.3d 76, 94–95 (2d Cir. 2017) (brackets omitted).

[77] *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011) ("The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990.").

28

Court should consider Menaker's allegations under such a theory as well.

At its core, a "cat's paw" case simply reflects a slight variation on the standard principles of vicarious liability.[78] In the Title VII context, it is well-settled that employers may be held vicariously liable for the conduct of their agents.[79] In such cases, the plaintiff generally must establish (1) that *the employer's agent* (a) was motivated by the requisite discriminatory intent, and (b) effected the relevant adverse employment action;[80] and (2) that the agent's conduct is imputable to the employer under general agency principles.[81]

---

[78] *See Vasquez v. Empress Ambulance Serv.*, 835 F.3d 267, 271 (2d Cir. 2016) (construing Title VII); *see also Staub*, 562 U.S. at 419 (construing the Uniformed Services Employment and Reemployment Rights Act).

[79] *Burlington Indus. v. Ellerth*, 524 U.S. 742, 754 (1998) ("[T]he term 'employer' is defined under Title VII to include 'agents.'" (citing 42 U.S.C. § 2000e(b))).

[80] *Vega*, 801 F.3d at 85.

[81] *Ellerth*, 524 U.S. at 754–55 ("Congress has directed federal courts to interpret Title VII based on agency principles . . . . We rely on the general common law of agency, rather than on the law of any particular State, to give meaning to these terms." (citation and internal quotation marks omitted)). Such common law agency principles provide for liability in circumstances where "the servant . . . was aided in accomplishing the tort by the existence of the agency relation," or where "the master was negligent or reckless." *Id.* at 758 (quoting the Restatement (Second) of Agency § 219(2)). Thus, when a supervisor fires an employee because of her sex (including for a failure to respond to a request for sexual favors), the employer is liable because "the injury could not have been inflicted absent the agency relation." *Id.* at 761–62. Similarly, when an employer negligently permits an employee to create an actionable hostile work environment, such conduct may be imputed to the employer because of this negligence. *Vance v. Ball State Univ.*, 570 U.S. 421, 446

In a "cat's paw" case, by contrast, only the *intent* of the agent is imputed to the employer.[82] Meanwhile, the *employer* ultimately accomplishes or effects the adverse employment action. In other words, the agent "manipulates an employer into acting as a mere conduit for his [discriminatory] intent."[83] In such cases, so long as the agent intended and was the proximate cause of the adverse result, the agent's discriminatory intent may be imputed to the employer under traditional agency principles.[84] These principles provide for liability where the employer was negligent because it acted at the agent's behest when it knew or should have known of the agent's discriminatory motivation.[85]

---

(2013) ("[A]n employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment.").

[82] To establish a claim through a "cat's paw" theory, a plaintiff must establish the agent's "intent" in two respects: (1) intent to discriminate, and (2) intent that the adverse action occur. *See Staub*, 562 U.S. at 419.

[83] *Vasquez*, 835 F.3d at 274–75 (internal quotation marks omitted); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (explaining that a Title VII plaintiff can succeed "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decision-making] process" (citation omitted)); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999) (recognizing that "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII . . . so long as the individual shown to have the impermissible bias played a meaningful role in the promotion process").

[84] *Vasquez*, 835 F.3d at 273–74.

[85] *Id.* at 273.

Here, Menaker has alleged facts from which it may plausibly be inferred that Hofstra served as a conduit for Kaplan's discriminatory intent and that this intent may be imputed to Hofstra.

First, it is plausible that Kaplan's accusations were motivated, at least in part, by Menaker's sex. While Kaplan's *primary* motivation may have been financial or vindictive, Title VII requires that we look beyond primary motivations. Indeed, courts must determine whether sex was a motivating factor, *i.e.*, whether an adverse employment action was based, even "in part," on sex discrimination.[86] Here, Kaplan did not accuse Menaker of just any misconduct; she accused him of *sexual* misconduct. That choice is significant, and it suggests that Menaker's sex played a part in her allegations.[87] A rational finder of fact could therefore infer that such an accusation was based, at least in part, on Menaker's sex.[88]

---

[86] *Walsh*, 828 F.3d at 75.

[87] *Cf. Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 149 (2d Cir. 2014) (observing that "false statements . . . intended . . . to establish a claim of racial harassment . . . could be viewed by a reasonable observer as themselves racial harassment").

[88] As with sexual harassment claims brought under Title VII, courts may find it easy to draw an inference of sex discrimination "in most male-female" scenarios of malicious allegations of sexual harassment. This is so because "it is reasonable to assume those [allegations] would not have been made [concerning] someone of the same sex." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998). As with sexual harassment, however, such an inference is not inevitable. If the allegations would have been leveled regardless of the plaintiff's sex, no sex discrimination has occurred. *See Brennan v. Metro. Opera Ass'n,* 192 F.3d 310 (2d Cir. 1999) ("[A]n environment which is equally harsh for both men and women . . . does

31

Second, drawing all inferences in Menaker's favor, Kaplan's intent may be imputed to Hofstra. We have previously held in the Title VII context that the conduct of certain non-employees may be imputed to the employer where (1) the employer exercises a "high degree of control over the behavior" of the non-employee, and (2) the employer's "own negligence" permits or facilitates that non-employee's discrimination.[89] Thus, in *Summa v. Hofstra University*, we held that the harassing conduct of student-athletes could, in principle, be imputed to the university under agency principles because the university exercised "a high degree of control over the behavior of its student football players."[90] In *Summa*, however, we concluded that the university did not act negligently, but instead took appropriate remedial action. These same agency principles govern the "cat's paw theory." Accordingly, the discriminatory *intent* of a student-athlete may also be imputed to a university where that university exercises a "high degree of control over the behavior" of the student-athlete and negligently permits her discriminatory conduct or effectuates her discriminatory intent.

---

not constitute a hostile working environment under the civil rights statutes."); *Brown v. Henderson*, 115 F. Supp. 2d 445, 450 (S.D.N.Y. 2000) ("Put bluntly, the equal opportunity harasser escapes the purview of Title VII liability." (citation and internal quotation marks omitted)).

[89] *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013).

[90] *Id.*

Here, Menaker's allegations suggest that Hofstra exercised the requisite degree of control over Kaplan. Hofstra controlled not only Kaplan's academic enrollment and athletic scholarship, but also the very complaint process by which she sought to effectuate her allegedly discriminatory intent. Indeed, Hofstra officials specifically referenced Kaplan's accusations in the course of terminating Menaker, thereby acknowledging that she had "played a meaningful role in the decision."[91] Accordingly, insofar as Hofstra negligently or recklessly implemented Kaplan's discriminatory design, her intent may be imputed to Hofstra. Here, in light of the procedural irregularities discussed above[92] (as well as Hofstra's knowledge of the scholarship dispute, the phone call from Kaplan's father, and the falsity of at least some of the accusations), a district court could plausibly conclude that Hofstra was negligent or reckless in acting on Kaplan's allegations.

While the facts alleged suggest that Hofstra might be liable under such a theory, further proceedings, of course, are necessary to establish whether there is evidence to support Menaker's allegations.

### III.   CONCLUSION

To summarize, we hold as follows:

(1) Where a university (a) takes an adverse employment action against an employee, (b) in response to allegations of sexual misconduct, (c) following a clearly irregular investigative or

---

[91] *Holcomb*, 521 F.3d at 143.

[92] *See* Section C, *ante.*

adjudicative process, (d) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances support a *prima facie* case of sex discrimination.

(2) When contesting an inference of bias based on procedural irregularity, an employer cannot justify its abandonment of promised procedural protections by recharacterizing specific accusations in more generic terms.

(3) Where (a) a student files a complaint against a university employee, (b) the student is motivated, at least in part, by invidious discrimination, (c) the student intends that the employee suffer an adverse employment action as a result, and (d) the university negligently or recklessly punishes the employee as a proximate result of that complaint, the university may be liable under Title VII.

(4) Menaker's Amended Complaint states a claim for sex discrimination.

For the foregoing reasons, we **VACATE** the September 27, 2018 judgment of the District Court and **REMAND** the cause to the District Court for further proceedings consistent with this opinion.